**Curtis E. OWENS**

v.

**DIAMOND M DRILLING COMPANY.**

**Civ. A. No. 17840.**

United States District Court,
W. D. Louisiana,
Alexandria Division.

Jan. 23, 1973.

———◆———

William Henry Sanders, Jens, La., for plaintiff.

John A. Jeansonne, Jr., Lafayette, La., for defendant.

NAUMAN S. SCOTT, District Judge:

Plaintiff, Curtis E. Owens, brings this action against defendant, Diamond M Drilling Company, under the General Maritime Law and the Jones Act, contending that at the time of his alleged accident he was a member of the crew of the "ST 65". Defendant, conversely, is of the opinion that plaintiff was not a seaman and that his exclusive remedy against it lies under the Longshoremen and Harbor Workers Act, as made applicable by the Outer Continental Shelf Lands Act. For this reason, defendant alleges that this Court is not possessed of jurisdiction over the subject matter of this action, and has filed a motion for summary judgment praying that this suit accordingly be dismissed.

FACTS

On or about January 3, 1972, plaintiff was employed by defendant and was assigned to Diamond M's Rig No. 55, which was situated on a fixed immobile artificial island belonging to Texaco, Inc. Counsel have stipulated that this island was situated on the Outer Continental Shelf. The rig and the artificial island were serviced by a tender, also belonging to Diamond M Drilling Company known as the "ST 65" which was a converted LST. On or about January 3, 1972, plaintiff allegedly sustained injuries aboard the artificial island while working as a "motorman" on Rig. No. 55, when a length of board allegedly fell from above and struck him on his safety helmet.

LAW

Defendant's present motion is based principally upon the recent decision by the United States Court of Appeals for the Fifth Circuit in Keener v. Transworld Drilling Company et al., 468 F.2d 729 (1972). In *Keener*, the plaintiff rested his claim to the status of a seaman upon his connection with a tender servicing a fixed drilling platform. It was contended that *Keener*, performed certain duties aboard the tender which were sufficient to bring him within the "evidentiary basis" doctrine enunciated by Offshore Co. v. Robison, 266 F.2d 769, 779 (5th Cir. 1959). In particular, it was pointed out that *Keener* allegedly spent three or four days during one hitch scraping paint and working in the

engine room of the tender while certain drilling platform equipment was inoperative. The Court of Appeals upheld the verdict of the District Court which had dismissed the Jones Act complaint against the defendant on a motion for summary judgment and held in a summary per curiam decision that "such incidental and temporary duty aboard the tender does not have the effect contended for by the appellant. The law requires more than a showing that the claimant perform the work of a seaman on one isolated occasion." (468 F.2d p. 731). To meet the requirement of *Robison* that the workman "performed a substantial part of his work on the vessel" the Fifth Circuit held without equivocation that it "must be shown that he [the seaman] performed a significant part of his work aboard the ship with at least some degree of regularity and continuity".

It is the contention of defendant that Owens did not perform a significant part of his work aboard the "ST 65", and certainly performed no work aboard that ship with any degree of regularity and continuity. The defendant thus argues that it is entitled to summary judgment in its favor, dismissing the complaint of Curtis E. Owens. This Court is in full agreement.

## EVIDENTIARY BASIS

Mr. Owens' alleged duties aboard the ST 65 are covered in his deposition of November 14, 1972 which was filed by the defendant in support of its motion. This deposition establishes that Mr. Owens was employed by Diamond M Drilling Company during October, 1971 (p. 3) and subsequently flown to the ST 65 (p. 4), a "support ship" or "tender", which during January 1972 was furnishing support services to a fixed immobile Texaco drilling platform situated in the Gulf of Mexico. When Mr. Owens first arrived the vessel was on location beside the platform and the plaintiff testified that he never moved from one location to another aboard the ST 65. (p. 4).

Two drilling crews and one roustabout crew lived aboard the ST 65 (p. 11).

The roustabouts made up the crew of the tender, made repairs to her when necessary, unloaded work boats and supplies and assisted in lifting supplies from the tender onto the adjacent Texas platform (p. 12). The drilling crews by contrast worked almost exclusively on the platform where the drilling rig and equipment were situated.

Curtis Owens was a member of the drilling crew, where he held the title of "motorman" (p. 5). His principal responsibility was to care for the large diesel engine which powered the rotary and drawworks which were situated on the platform near the drilling rig (p. 6). In the course of plaintiff's testimony, it developed that his connection with the vessel lay in three principle areas: (A) He lived and ate on the vessel; (B) He was sometimes trapped on the ship when it broke away from the Texaco platform; and (C) He sometimes performed other miscellaneous duties aboard the ST 65.

### (A) Living and Eating

Although Mr. Owens contends he was permanently assigned to and lived and ate about the ST 65, this factor alone is not determinative of his right to seaman status. Noble Drilling Corp. v. Smith, 412 F.2d 952 (5th Cir. 1969), Freeman v. Aetna Casualty & Surety Co., 398 F.2d 808 (5th Cir. 1968).

### (B) Breakaways

On some occasions during rough weather the anchor chains of the ST 65 would break and the vessel would be pulled back from the Texaco platform (p. 13). If a roughneck happened to be on the platform when this occurred he would remain there; if, on the other hand, he was on the tender when the breakaway took place, he would stay there to put in twelve hours of labor (p. 13). Activities on the tender included chipping, painting, working on pumps, washing, cleaning up, helping the roustabout crew, tying down pipe, tying down acetylene bottles and washing anchor chains (generally see pp. 13–15,

78

20, 22, 26 & 29). Although these random duties were performed aboard the vessel during a breakaway, there is evidence in the record indicating that part of the time was spent idly watching the anchor chains to make sure that they did not break (pp. 17–18).

### (C) Other Miscellaneous Duties

While the ST 65 was tied beside the platform and drilling operations were carried on in a normal manner, the plaintiff had few occasions to work aboard the vessel. Owens testified that he spliced cable one time (pp. 20–21) a procedure which occupied him for between thirty minutes to one hour, straightened barrels of oil and lubricants (p. 21), worked on pumps (pp. 22–23), and mixed mud (p. 23). Somewhat more commonplace was the duty of "fetch and carry"; that is, returning tools and small items to the tender or going from the drill floor to the tender to fetch some item. The plaintiff testified that this process might occur between three and five times per day (p. 24). While on the tender to fetch however the plaintiff generally grabbed the item which he had come to get and returned to the drill floor without doing any additional work (p. 26).

### CONCLUSIONS

All in all, it is the opinion of this Court that the work done aboard the tender by the plaintiff falls far short of constituting convincing evidence that he functioned as a member of the crew of that vessel. He cannot, for example, recall how frequently the ST 65 broke away from the platform between his employment in October and his accident in January (p. 13). However, he is certain that on at least some occasions he was on the platform and did not work on the vessel during the breakaway (p. 13). Even when he was present on the vessel, he performed work of very little consequence and seemed to spend most of his time doing nothing more than standing anchor watch (pp. 17–18). Much of the same is true of the claim-

ant's miscellaneous activities aboard the ST 65. He recalled several occasions when he straightened barrels of oil and lubricant, worked on pumps, and mixed mud, but did not think enough of these activities to estimate the amount of time taken up by them in an accurate manner (pp. 21–23).

As to his frequent occupation of "fetch and carry" this Court believes that the plaintiff's admission that he performed little work aboard the vessel while "fetching" makes these activities of minimal importance in arriving at a solution to the problem of status (p. 26). By descending from the platform to the vessel, the plaintiff did not contribute to the function or mission of the ST 65; rather, he used the vessel as a floating storehouse and was little more than a casual passenger during his trips for supplies and necessities.

All of plaintiff's work activities on board the ST 65 were irregular and fortuitous in nature. They were irregular and insubstantial and were not performed with "regularity and continuity" required by *Keener*. The plaintiff testified that none of these jobs were done on a "regular basis; that is (he) * * didn't do any of them everyday, day in day out." (p. 33). To put it in simplest terms, the plaintiff "didn't expect to do them when (he) * * * woke up in the morning" (p. 33).

There is little to distinguish the case of Curtis Owens from others involving tenders, platforms or roughnecks. The plaintiff was employed by Diamond M Drilling Company because of his expertise around drilling rigs and equipment, not because of his knowledge of ships and the sea. Mr. Owens arrived on the scene after the ST 65 was fully anchored and prepared for drilling operations and he never traveled with the vessel from one location to another. During the two short months that lapsed in between his employment in October and his alleged injury in January the claimant's activities on and in connection with the vessel are minimal in nature and in no way justify his contention that he

served as a member of the crew of the tender.

Considering these factors and the more important conclusion that the plaintiff cannot satisfy the requirements set forth by *Keener*, it is the opinion of this Court that defendant's motion for summary judgment on seaman's status is well founded. Accordingly, this suit shall be dismissed at the plaintiff's costs. In accordance with Rule 9(e), defendant should submit a formal judgment.